IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLIANCE FOR TELECOMMUNICATIONS :
INDUSTRY SOLUTIONS, INC. :
:
        v. : CIVIL NO. CCB-05-440
:
EDWARD A. HALL, ET AL. :
...o0o...

**MEMORANDUM**

      Following a jury trial in September 2006, defendants Edward A. Hall ("Mr. Hall") and

TelecomXChange International LLC ("TXI")[1] have renewed their motion for judgment as a

matter of law (docket entry no. 154) and also moved for a new trial (docket entry no. 155).

These motions have been fully briefed, and a hearing was held in this case and the related suit of

*IFAST, LTD. v. Alliance for Telecommunications Industry Solutions, Inc.*, CCB-06-2088

("second or current IFAST suit"), on June 25, 2007.  The plaintiff, Alliance for

Telecommunications Industry Solutions, Inc. ("ATIS"), has filed a motion to amend the

judgment to include pre-judgment interest (docket entry no. 156).  The defendants filed a motion

for an extension of time to oppose the motion to amend (docket entry no. 160), which ATIS has

opposed (docket entry no. 165).  For reasons that will be discussed below, the defendants'

renewed motion for judgment as a matter of law will be granted for the claims of conversion of

the logo (to the extent it is preempted by the Copyright Act) and the database, but otherwise

denied.  The defendants' motion for a new trial will be granted on the issue of damages for

---

    [1]  Any subsequent reference to "the defendants" should be understood as referring to Mr.
Hall and TXI only, unless otherwise specified.

conversion of the contested accounts receivable[2] and on the claim for conversion of any tangible property embodying the logo, if the plaintiff wishes to pursue this claim.  Because pre-judgment interest can be granted only once damages have been established, ATIS's motion to amend the judgment is not timely in light of the granting of a new trial, and it will be denied without prejudice.  The defendants' motion for an extension of time to oppose ATIS's motion to amend is granted, although the request is effectively moot due to the dismissal of ATIS's motion.  The judgment against Mr. Hall for $6,333 in compensation and against Mr. Hall and TXI for $100,000 in lost value to ATIS will stand.

## BACKGROUND

ATIS is a leading not-for-profit trade association in the telecommunications industry. Established in the 1980s, ATIS now has more than 300 member companies.  Its mission is to develop and promote technical and operational standards for the benefit of the communications industry.  ATIS undertakes its work through more than 20 open industry committees and forums, and, in the past, the International Forum on ANSI-41 Standards Technology ("IFAST") forum came under its umbrella in some fashion.[3]

IFAST formed in the 1990s as an open international forum focusing on issues arising from international roaming services used by subscribers to ANSI-41-based wireless networks.

---

[2] These are International Roaming Mobile Identification Numbers ("IRM") fees that should have been invoiced prior to Mr. Hall's departure but were not.

[3] Recognizing that there are contested issues about IFAST's legal identity across time, this opinion will refer generally to "IFAST" to designate the entity which has always been responsible for IRM administration and has had other constant features.  When it is necessary to distinguish between IFAST as a forum or unincorporated association and IFAST as a corporation, it will be done explicitly.

Among other duties, IFAST assigns and maintains International Roaming Mobile Identification

Numbers ("IRMs").  IRMs are wireless telephone codes assigned to domestic cellular telephones

so individuals traveling internationally will not experience conflicts with telephone numbering

systems in foreign countries.  Without IRMs, wireless ANSI-41-based networks could not offer

international roaming services.

IFAST has obtained administrative support through other organizations that have agreed

to serve as IFAST's secretariat, a function consisting primarily of: (1) maintaining records; (2)

arranging meetings; (3) collecting funds on behalf of IFAST; and (4) other secretarial and

clerical duties.  IFAST has had a series of secretariats.  The first secretariat was the organization

now known as the Cellular Telecommunications and Industry Association ("CTIA").  The

second, for a brief period,  was the Telecommunications Industry Association ("TIA").  The third

alleged secretariat, starting in mid- 2000 and continuing until late 2004, was ATIS.  The exact

nature of IFAST's relationship with ATIS is contested (both in this litigation and in the current

IFAST suit) and will be analyzed later in this opinion.

Mr. Hall, a founding organizer of IFAST, left CTIA and became employed with ATIS in

May 2000 as a vice-president.  Mr. Hall was assigned the responsibility of overseeing ATIS's

growing technical programs, including, but not limited to, involvement in the wireless industry.

Once ATIS decided to sponsor IFAST, Mr. Hall participated in the operations of IFAST in

connection with ATIS.  He claims that he also participated in his personal capacity.

Defendant David Crowe and his company, Cellular Networking Perspectives, Ltd.

("CNP"), have performed numbering resource assignment, database design, and other technical

services for IFAST since October 1999.  Mr. Crowe also assisted ATIS with invoicing and

billing IRM subscribers.

By no later than May 2004, while still in ATIS's employ, Mr. Hall made his interest in finding employment elsewhere known to third parties.  He was unsuccessful in his attempts to find a new job.  In October 2004 Mr. Hall, allegedly with the assistance of defendants Lynsie Hall (his wife) and OmniLearn LLC (Ms. Hall's company), commenced steps to establish a separate business entity to take over the administration of IFAST.  On November 12, 2004, Mr. Hall registered TXI as an active business corporation with the State of Maryland.  He then tendered his resignation from ATIS on November 15, 2004.  Though he sought to terminate his employment that day, upon discussion with ATIS President Susan Miller Mr. Hall agreed that his resignation would become effective on November 24, 2004.

In December 2004, IFAST notified ATIS that IFAST no longer required any support from ATIS and requested that all IFAST material be returned to Mr. Crowe.  This decision was made by IFAST's five-member management team, which consisted of: (1) David Grootwassink, an executive at VeriSign; (2) Syed Zaeem Hosain, Chief Technology Officer of Aeris, Inc.; (3) Bernardo Martinez, a representative of a number of Mexican telecom companies; (4) David Crowe; and (5) Edward Hall.  IFAST has been provided with secretariat, coordinating, and management services by TXI since December 2004.  Pursuant to this arrangement, IRM administration fees are remitted to TXI's bank account in Maryland.  TXI, in turn, pays Mr. Crowe and CNP a flat monthly fee for IRM administration services.

In early January 2005, IFAST's management team decided to incorporate the association as a nonprofit company under Maryland law.  Incorporation of an entity known as IFAST, LTD. was effected on February 17, 2005.  This corporation has been the plaintiff in two suits against

4

ATIS.[4]  The five management team members agreed to serve as the company's initial directors, although Mr. Grootwassink later resigned at the request of his company, VeriSign, which is represented on ATIS's board of directors.

ATIS brought various claims against Mr. Hall, Ms. Hall, Mr. Crowe, TXI, CNP, and OmniLearn arising out of the circumstances of Mr. Hall's departure from ATIS, the formation of TXI, and IFAST's subsequent move to TXI for secretariat services.  A seven-day jury trial was held beginning on September 11, 2006.  Judgment was entered against Mr. Hall on the claim he breached his fiduciary duty to ATIS, and against Mr. Hall and TXI on the claims they unlawfully converted assets belonging to ATIS and tortiously interfered with ATIS's economic relations. Judgment was entered against the plaintiff on the conspiracy claims brought against all the defendants, as well as on all the other claims brought against Ms. Hall, Mr. Crowe, CNP, and OmniLearn.  The jury awarded compensatory damages of $6,333.00 (compensation ATIS paid to Mr. Hall), $439,000 (market value of ATIS's converted assets), and $100,000 (ATIS's lost value).  Punitive damages were not awarded.

During trial, all of the defendants twice moved for judgment as a matter of law.  Mr. Hall and TXI made a timely renewal of this motion with respect to the conversion and tortious interference with economic relations claims.  They also timely moved for a new trial on these claims.

**ANALYSIS**

---

[4]  The first suit, *IFAST, LTD. v. ATIS, Inc. & Susan Miller* (CCB-05-1448) ("first IFAST suit") was dismissed on March 28, 2006 due to IFAST, LTD.'s lack of standing; the current IFAST suit also is being dismissed for reasons stated in an opinion issued concurrently with this memorandum.

*Legal Standards for Judgment as a Matter of Law and New Trial*

A party is entitled to judgment as a matter of law on an issue following a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." Fed. R. Civ. P. 50(a)(1).  The court may then decide the issue against the non-moving party and "grant a motion for judgment as a matter of law against the [non-moving] party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1)(B).  If such motion is made before the case is submitted to the jury but not granted by the court, it is subject to renewal no later than ten days after judgment is entered.  Fed. R. Civ. P. 50(b).  Upon renewing the motion, the movant may also bring a motion for a new trial under Rule 59.  *Id.*

In order to grant a motion for judgment as a matter of law, "the district court must examine the evidence in the light most favorable to the non-moving party and determine 'whether a reasonable trier of fact could draw only one conclusion from the evidence.'" *Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir. 1994) (internal citation omitted); *see also Rhoads v. FDIC*, 286 F. Supp. 2d 532, 539 (D. Md. 2003), *aff'd*, 94 Fed. Appx. 187 (4th Cir. 2004) (unpublished) (explaining that all reasonable inferences should be drawn in favor of the non-movant).  If reasonable triers of fact could reach different results, however, the jury's verdict must be affirmed.  *See id.* at 538-39; *see also Adkins v. Crown Auto Inc.*, 488 F.3d 225, 232 (4th Cir. 2007) (setting out approach under Rule 50).  More than a scintilla of evidence is needed in support of the non-movant's case; according to the federal standard, which the Fourth Circuit requires a district court to apply when sitting in diversity, judgment as a matter of law should be granted when the party opposing the motion "has failed to adduce substantial evidence

in support of his claim." *Demaine v. Bank One, Akron, N.A.*, 904 F.2d 219, 220 (4th Cir. 1990) (internal references omitted).

Alternatively, a motion for a new trial should be granted if "'(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *McCollum v. McDaniel*, 136 F. Supp. 2d 472, 475 (D. Md. 2001) (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998), *aff'd*, 32 Fed. Appx. 49 (4th Cir. 2002) (unpublished). In deciding a Rule 59(a) motion, the court is permitted to "weigh the evidence and consider the credibility of witnesses." *Id.*; *see also Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 706 (D. Md. 2002) (differentiating between motions under Rule 50 and Rule 59; the district court is not permitted to weigh the evidence in the former). New trials should be granted when necessary "'to prevent an injustice,'" however, they are not to be granted "'unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *Id.* (internal citations omitted).[5]           *Summary of Defendants' Arguments*

The defendants' main argument is as follows: prior to and during the course of its relationship with ATIS, IFAST was an unincorporated association. As an unincorporated association, IFAST could not have turned over any of its property to ATIS absent the consent of all its members, which it did not have. No formal contract or agreement was ever entered into between IFAST and ATIS. Because ATIS never acquired IFAST or its property, the properties

---

[5] As will be discussed further below, federal standards do not apply when a district court, sitting in diversity, is considering a motion for a new trial based on excessiveness of damages. *See Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999).

it claims were converted– the IRM billing database ("billing database" or "database"), the ATIS

IFAST logo ("logo"), and IRM fees that should have been invoiced prior to Mr. Hall's departure

but were not ("contested accounts receivable")– could not have been converted.  Similarly,

because ATIS never acquired IFAST, there could not have been any interference with ATIS's

relationships with the IRM-holders because those relationships belonged to IFAST as the entity

in charge of assigning IRMs and the association of which these IRM-holders were members.

With respect to the conversion of the database and the logo, the defendants also contend

they are intangible property not subject to conversion, and even if they were convertible forms of

property, ATIS retained copies of them.  The defendants further argue that any claims

concerning the reproduction of the database or the logo are preempted by the Copyright Act.  In

support of their motion for a new trial, they also argue that the damages awarded for conversion

were "improperly speculative" and not properly based on the trial record.

*IFAST's Legal Status and Proposed Jury Instruction on Unincorporated Associations*

Although the defendants maintain IFAST's legal status is the threshold issue on which

these motions depend, it is in fact not necessary to resolve in order to rule on these motions.[6]  It

must be resolved in order to decide the motion to dismiss the related case of *IFAST, LTD. v.*

*ATIS, Inc.* (CCB-06-2088) ("current IFAST suit"), however, and for reasons set out in the

opinion dismissing that case, it is clear the IFAST forum was an unincorporated association.

This conclusion does not provide a basis for holding in the defendants' favor on their motions.  It

---

[6]  The defendants suggest the court already resolved the unincorporated association issue
in the first IFAST suit.  No final status determination, however, was made in that case.  The
opinion dismissing the case for lack of subject matter jurisdiction assumed the IFAST forum was
an unincorporated association, a position advanced by IFAST, LTD. and not contested by ATIS
for the purposes of that motion.

establishes only that as a matter of Maryland law, the IFAST forum could own property, *see Save-A-Patriot Fellowship v. United States*, 962 F. Supp. 695, 699 (D. Md. 1996), and that it could not incorporate absent the consent of all its members, *see IFAST, LTD. v. ATIS, Inc. & Susan Miller*, No. CCB-05-1448 (D. Md. Mar. 28, 2006) (unpublished) (granting ATIS's motion to dismiss for lack of subject matter jurisdiction).  It does not establish that the IFAST forum owned the property at issue in this case, or that it had not entered into some type of arrangement with ATIS regarding property that was jointly created or maintained.  It also does not establish that ATIS did not develop its own relationship with IRM subscribers.  It is undisputed that ATIS had some type of relationship with IFAST[7] in which the database, the logo, and the contested accounts receivable were involved.   The record developed at trial establishes that representatives from both ATIS and IFAST participated in creating and/or maintaining the database and accounts receivable, and it appears that an ATIS representative alone created the logo.

This determination regarding the IFAST forum's legal status does not alter the fact of ATIS's involvement in these three areas or its interaction (albeit limited) with IRM subscribers through sending invoices and receiving IRM fees.  The defendants claim to be asking the court to apply a legal rule whereby an unincorporated association's attempts to give away its property

---

[7]  The terms of the relationship were not formalized at the outset, nor at any point thereafter (although ATIS did vote to amend its by-laws to make IFAST one of its committees, but as the consent of the IFAST membership does not appear to have been obtained, this would hardly bind IFAST) (Trial Tr., 66:23- 67:3, Sept. 11, 2006).  The foundation was laid by conversations between Ms. Miller and Fred Gaechter, then-chair of IFAST, as well as a letter written by Mr. Gaechter.  Ms. Miller seems to have understood the arrangement as one of permanent sponsorship of IFAST by ATIS, whereas IFAST seems to have viewed ATIS as yet another secretariat.

or merge with another entity are invalid absent consent of the association's membership, however, the legal rule necessary to support their desired outcome would be that the results of any collaboration between an unincorporated association and another entity must belong to the unincorporated association– or at least cannot belong to the other entity– if they involve the property or interests of the association in any way and are not otherwise governed by a formal contract.  The defendants do not identify any case law to support this latter proposition, nor does it appear to be an accurate statement of law.  Neither the rule the defendants purport to advance nor the rule they actually seek thus provide a basis for granting judgment as a matter of law; the former because it does not decide the true threshold issues for the conversion and tortious interference claims, the latter because no basis exists to believe it is valid law.

Focusing now on the conversion claims, the true threshold issue is not IFAST's legal status but ownership, because the defendants could not have converted property to which they already had a legal right.  *See Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 963, 354 Md. 547, 560 (Ct. App. 1999) (requiring act in denial of or inconsistent with rights of owner to constitute conversion).  In order to find for ATIS on the conversion claims, the jury thus had to determine that the database, logo, and contested accounts receivable belonged to ATIS.  Viewing the evidence in the light most favorable to ATIS and drawing all reasonable inferences in its favor, there is more than one conclusion a reasonable trier of fact could reach regarding ownership of these three items.

Importantly, neither the logo nor the accounts receivable existed prior to the beginning of IFAST's relationship with ATIS.  ATIS offered substantial testimony to show that its employee created the logo (Trial Tr., 130:6-11, Sept. 12, 2006; Trial Tr., 140:9-10, Sept. 14, 2006) and that

IRM subscribers were not invoiced prior to IFAST's move to ATIS (Trial Tr., 5:19-24, Sept. 14, 2006).  IRM subscribers were sent invoices by ATIS, and the funds received were deposited in ATIS's general account.  (Trial Tr., 106:25-107:7, Sept. 13, 2006.)  While it is true ATIS would never have been able to bill for IRM codes absent its relationship with IFAST, this fact and others demonstrating IFAST's integral or even primary role in assigning and invoicing for IRM codes (such as invoices requesting payment to IFAST c/o ATIS) do not establish that a reasonable trier of fact could only reach one conclusion about ownership; in fact, the depositing of the received fees in ATIS's general account suggests an understanding that ATIS would have control over the funds.  (Trial Tr., 210:2-22, Sept. 12, 2006.)

The exact origination date of the database is less clear.  The database was used to send invoices, which were not sent prior to IFAST's entering into a relationship with ATIS, suggesting that it arose over the course of that relationship as well.  The information in it related to IRM subscribers, and IFAST had been administering IRM codes prior to its affiliation with ATIS, thus at least some of the information existed in some form before the IFAST/ATIS relationship.  (Trial Tr., 4:24-5:9, Sept. 14, 2006.)  David Crowe, acting for IFAST, developed and maintained the software portion of the database, while Megan Hayes, an ATIS employee, managed the information contained in the database.  (Trial Tr., 165:19-166:13, 167:2-168:6, Sept. 13, 2006.)  Through Mr. Crowe and Ms. Hayes, IFAST and ATIS regularly exchanged updated versions of the database to keep both the information and the software current.  Given this collaboration, the ownership of the database seems like a close question.  As the defendants are entitled to judgment as a matter of law on this claim for other reasons that will be discussed below, however, having to do with what exactly constituted the database, this issue need not be

resolved definitively.

Turning now to the tortious interference with economic relations claim (specifically, interference with ATIS's existing and prospective business relationships with IRM subscribers), determining the IFAST forum was an unincorporated association also fails to provide a basis for entering judgment in favor of the defendants on this claim.  Membership in an unincorporated association would not have precluded subscribers from also having an economic relationship with ATIS, even if it did not rise to the level of somehow joining ATIS the same way they had joined IFAST.  Indeed, this type of claim is generally brought based on interference between a business and its customers; it is not required that these customers somehow become part of the business.  *See*, *e.g.*, *K & K Mgmt.*, *Inc. v. Lee*, 557 A.2d 965, 975, 316 Md. 137, 157-58 (Ct. App. 1989) (bringing claim based on interference with prospective restaurant customers).

As the court properly instructed the jury, to succeed on this claim:

> ATIS must show an intentional and willful act by a defendant, calculated to cause damage and loss to ATIS in its lawful business or to ATIS' economic rights, done by the defendant with the unlawful purpose of causing such damage and loss to ATIS without justifiable cause or right, and actual damage and loss resulting to ATIS.[8]

(Trial Tr., 22:3- 9, Sept. 19, 2006.)  Although IRM subscribers arguably had a stronger relationship with IFAST by virtue of their membership in IFAST and IFAST's responsibility, from its inception, for assigning IRM codes, there is substantial evidence in the record that ATIS developed and maintained its own economic relationships with subscribers, most importantly in

---

[8]  The court further instructed the jury that "both conversion and the breach of fiduciary duty of an employee or agent may constitute wrongful or unlawful acts for purposes of this claim."  (Trial Tr., 22:18-21, Sept. 19, 2006.)    As Mr. Hall does not challenge the jury's verdict on the breach of fiduciary duty claim and, as will be discussed further below, the jury's verdict against TXI on one of the converted items– the contested accounts receivable– will also stand, this element of the claim is satisfied.

the form of sending invoices and receiving payments of IRM fees.  ATIS was deprived of– or at

least seriously disadvantaged with respect to– the opportunity to continue these relationships

because the manner in which Mr. Hall proceeded with his plans to leave ATIS, start TXI, and

solicit IFAST's business kept ATIS from also competing for it.  As there is thus more than one

conclusion a reasonable jury could have reached on the issue of whether ATIS had its own

relationships with IRM subscribers with which the defendants could have interfered, there is no

basis to disturb the jury verdict.

Because IFAST's legal status does not control the threshold issues on which the

conversion and tortious interference claims turn, it did not prejudice the defendants for the jury

not to have received their proposed instruction on unincorporated associations; indeed, the court

properly excluded it.  *See Johnson v. MBNA Am. Bank*, *NA*, 357 F.3d 426, 432 (4th Cir. 2004)

(explaining that instructions should "'adequately inform the jury of the controlling legal

principles without misleading or confusing the jury to the prejudice of the objecting party'")

(internal citation omitted).  The defendants are thus not entitled to a new trial on this basis.

Having addressed the defendants' primary argument about IFAST's legal status, which

they mistakenly contend resolves every issue in their favor, I will now examine the defendants'

secondary arguments regarding each conversion claim.[9]

*Conversion– Logo*

As mentioned above, the logo was created by an ATIS employee, Ms. Hayes, for use in

conjunction with IFAST's activities.  (*See* Trial Tr., 17:11-14, 130:6-11, 210:15-22, Sept. 12,

---

[9] No secondary arguments were made about the tortious interference claim.

13

2006.)  While IFAST was still associated with ATIS, the logo was used on the IFAST Journal as well as on the invoices sent to IRM subscribers.  (*See id.* at 130:6-11, 210:15-22.)  After IFAST entered into an arrangement with Mr. Hall and TXI, ATIS alleges that the logo it developed for IFAST was altered and used by the defendants for their work on behalf of IFAST.  (*See id.* at 230:14- 232:11.)

The defendants advance several theories in support of their renewed motion for judgment as a matter of law with respect to conversion of the logo.  The only ground properly before the court at this time is the argument that this claim is preempted by the Copyright Act.  Arguments may not be made in a renewed motion for judgment as a matter of law under Rule 50(b) that were not advanced in the initial motion(s) for judgment as a matter of law during trial under Rule 50(a).  *See* 9A Charles Wright & Arthur Miller, Federal Practice and Procedure § 2537 (2d ed. 1995) (explaining that because "the post-submission [to the jury] motion [for judgment as a matter of law] is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence,[10] it cannot assert a ground that was not included in the earlier motion.")   Because the defendants failed to contend during their Rule 50(a) motions that the logo was not a convertible form of property or that the plaintiff retained a copy of it, they cannot now offer these arguments in their Rule 50(b) motion.

Mr. Murphy, defendants' counsel, presented their preemption argument during his motion for judgment as a matter of law at the close of the plaintiff's evidence in the following

---

[10]   The latest round of advisory comments to Fed. R. Civ. P. 50 emphasize that a motion for judgment as a matter of law during trial can be made at any point, not just at the close of the evidence.  This flexibility, however, does not alter the basic premise that by virtue of its status as a renewed motion, a motion brought under Rule 50(b) is limited to the grounds asserted in the previous Rule 50(a) motion(s).

14

manner:

> Now if this were a copyright case, there are some theories about the way in which you compile the information [in the billing database] that's available to anybody out there [sic] might be subject to protection; but if anybody has that, it's David Crowe, and it's not a copyright case anyway.  If that's what they [the plaintiff] are [sic] complaining about, Your Honor, and this just occurs to me, it's preempted anyway by copyright law. The same is probably true, although I haven't given [sic] a great deal of thought, with respect to the logo.  They're saying that, you know, the logo was converted in some way. I'm not sure that's not preempted.

(Trial Tr., 144:22-145:9, Sept. 14, 2006.)[11]   While this may not constitute the level of legal argument with which the court would hope to be presented, in the context of this particular litigation, it adequately introduces the preemption issue with respect to the logo such that it is appropriately re-asserted in the current Rule 50(b) motion.[12]

It was not clear prior to trial whether ATIS would be pursuing the claim that the defendants converted the logo.  The complaint (count II ¶ 65) broadly asserts that ATIS had a possessory interest in all IFAST assets, including but not limited to the IRM assignment[13] and billing databases.  The logo was not specifically mentioned.  During the hearing on the plaintiff's motion for a preliminary injunction, plaintiff's counsel did discuss the logo in the context of

---

[11]   Although Mr. Murphy did not mention the preemption issue again during his motion for judgment as a matter of law at the close of all the evidence, he incorporated all of his previous arguments by reference.

[12]   Mr. Murphy contends that preemption implicates subject matter jurisdiction, thus it can be raised at any point.  The case he relies on for this proposition, *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327 (Cal. Ct. App. 1990) (unpublished in part), is from a state appellate court.  It held that preemption could be raised on appeal, even if not raised in the trial court, because it goes to the jurisdiction of a *state* trial court due to "federal law giv[ing] exclusive jurisdiction over copyright disputes to the federal courts."  *Id.* at 1338-39.  As this court would not lack subject matter jurisdiction over a copyright claim, Mr. Murphy's argument is not persuasive.

[13]   ATIS did not ultimately pursue a conversion claim for the IRM assignment database.

conversion and "re-branding" (Mot. Tr., 615:22-616:10, May 19, 2005).  Indeed, the court's oral

ruling on that motion stated: "There is reference to the logo and other things that have been

rebranded, but, again, I don't believe that supports a claim for conversion.  There may or may

not be an intellectual property issue there of some kind, but I don't see that it supports a claim

for conversion."  (Mot. Tr., 17:19-23, May 26, 2005.)

Perhaps mindful of this statement, plaintiff's counsel (Mr. Taffet) did not list the logo as

an item that was allegedly converted in the parties' joint pre-trial order (*see* Joint Pre-Trial Order

¶¶13-15).  It was, however, included in the plaintiff's proposed jury instructions on conversion

filed shortly after the pre-trial order.[14]  This lack of clarity regarding the plaintiff's position on

the logo may be seen in the court inquiring of the plaintiff's counsel, during his opposition to the

defendants' first motion for judgment as a matter of law at the close of the plaintiff's evidence,

"what are the assets of ATIS that were converted?"  (Trial Tr., 139:12-13, Sept. 14, 2006.)

Presumably, the inclusion of the logo in this list prompted Mr. Murphy to mention the possibility

it was preempted in his reply to Mr. Taffet's response.[15]  Mr. Taffet did not comment on the

preemption issue at any point during his opposition to Mr. Murphy's two motions for judgment

as a matter of law during trial.

---

[14] It should be noted that while the defendants filed their proposed jury instructions the same day as the plaintiff, theirs were filed roughly two hours before the plaintiff's.

[15] Indeed, at the opening of the defendants' first motion for judgment as a matter of law, Mr. Murphy said it was his understanding that ATIS claimed the converted assets were "this billing issue [unclear whether this refers to the billing database or the contested accounts receivable] and the fees that David Crowe earned for his work for IFAST for that couple of month period after the termination."  (Trial Tr., 127:7-10, Sept. 14, 2006.)  He did not think ATIS was pursuing a claim for conversion of the logo.

Rule 50's specificity requirement[16] serves to inform the non-moving party of the basis for the motion so the party may attempt to cure any deficiencies in its case identified by the motion prior to the case being submitted to the jury.  *See generally Miller v. Premier Corp.*, 608 F.2d 973, 980 n.3 (4th Cir. 1979) (explaining that "the requirement of a proper [motion for judgment as a matter of law] as a foundation for a [renewed motion for judgment as a matter of law] under Fed. R. Civ. P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation.") (internal citations omitted).  Motions under Rule 50(a) usually raise questions of the factual sufficiency of the non-moving party's case, *see generally* Fed. R. Civ. P. 50 advisory committee's note (1991), but a legal argument forms a proper basis for a Rule 50(a) motion as well, *see Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 421 (4th Cir. 2005) (explaining that under Rule 50(a), "'a party may appropriately move for judgment as a matter of law on discrete *legal* issues'") (quoting *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995)) (emphasis added in *Varghese*).  When considering the specificity requirement in the context of a purely legal argument, rather than one based on sufficiency of the evidence, fairness would seem to require at a minimum that the non-moving party be apprised of the legal grounds on which an issue is being challenged so an opposition could be mounted.

Mr. Murphy's statement that he was not sure the claim for conversion of the logo was not preempted by the Copyright Act does identify the statutory scheme upon which his position relies, although it is hardly a thorough or forceful argument.  Given the court's previous

---

[16] "The motion [for judgment as a matter of law] must specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).

suggestion that the logo seemed more likely to raise an intellectual property claim than one for conversion, a more developed argument on this point might have been expected (especially in light of the logo's inclusion in the plaintiff's proposed jury instructions, signaling that a claim for its conversion likely would be advanced at trial). The court's prior statement also would have informed the plaintiff of the potential for a challenge to the legal validity of its claim for conversion of the logo, however, and thus it should have come as no surprise to the plaintiff when Mr. Murphy raised the issue of preemption upon Mr. Taffet stating he intended to advance this claim. Under all the circumstances, it is appropriate for the court to resolve the substantive legal issue at this time.

ATIS's contention that the defendants waived their ability to object to the legal sufficiency of the conversion claims because they submitted a proposed jury instruction regarding conversion and failed to object when the conversion instruction was given is not persuasive. It would not have been clear to the defendants before they submitted their proposed jury instructions that the plaintiff intended to pursue the conversion claim with respect to the logo. The logo was not mentioned in the pre-trial order, and the plaintiff's proposed jury instructions were submitted after the defendants'. It would have been clear, however, that the plaintiff was pursuing a conversion claim for the billing database and the accounts receivable, the latter of which is well established as the legitimate subject of a conversion claim, *see Medi-Cen Corp. of Maryland v. Birschbach*, 720 A.2d 966, 972, 123 Md. App. 765, 778 (Ct. Spec. App. 1998).

Knowing that at least one conversion claim about which they had no arguments regarding legal sufficiency would be raised, the defendants properly submitted a jury instruction on conversion.

18

Construing this, as the plaintiff would have the court do, as implicitly consenting to submitting the matter of the logo to the jury would be unfair, given that the plaintiff failed to include the logo in the pre-trial order.[17]  The defendants thus would have had no reason to be aware that their proposed instruction would be applied to the logo as well.

Furthermore, failure to object to the court's conversion instruction does not somehow revoke the legal argument made under Rule 50(a) that no claim for conversion of the logo can be brought.  *See College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 600, n.10 (4th Cir. 2005) (failing to object to a jury instruction did not "waive the position [the party] had already unsuccessfully presented to the district court" on the legal issue encompassed by the instruction).  It does, however, foreclose the defendants' ability to ground their request for a new trial in the court's giving this instruction, which they are not doing.  *See* 11 Charles Wright, Arthur Miller & Mary Kane, Federal Practice and Procedure § 2805 (2d ed. 1995) (explaining that while "the giving or refusal of instructions" are generally grounds upon which a new trial motion can be based, "[a] principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial . . .").  *See also* 9A Wright & Miller, Federal Practice and Procedure § 2537 (cautioning that a party's failure "to object to the jury instructions does not make them the law of the case so as to preclude the entry of judgment as a matter of law if it is

---

[17]  These circumstances distinguish this case from *Rhoads*, which the plaintiff relies on for the general proposition that submission of a jury instruction on an issue constitutes a waiver of ability to seek a new trial or post-trial judgment as a matter of law on that issue.  In *Rhoads*, "the defendant proposed a jury instruction on the issue of back pay, strongly evidencing its expectation that the jury would decide the issue," 286 F. Supp. 2d at 538; in contrast, the defendants here did not propose a jury instruction specifically including language about the logo, nor would they have necessarily known at the time of submitting their jury instructions that the plaintiff was going to argue the logo was one of ATIS's converted assets.

required by law"); *cf. City of St. Louis v. Praprotnik*, 485 U.S. 112, 118-21 (1988) (applying this principle to conclude that the petitioner's failure to object to a jury instruction during trial did not preclude the legal issues involved in the instruction from being preserved for appeal where the petitioner had raised them in a motion for summary judgment and a motion for judgment as a matter of law during trial, and the petitioner was concerned with the denial of these motions, not with the giving of the jury instruction) (internal citations omitted).

Turning now to the substance of the preemption argument, a two-step test must be applied to determine whether the claim for conversion of the logo is preempted by the Copyright Act (17 U.S.C. §§ 101 *et seq.*).  *See United States ex. rel. Berge v. Bd. Trs. Univ. Alabama*, 104 F.3d 1453, 1463 (4th Cir. 1997).  First, it must be determined whether the logo falls "'within the scope of the "subject matter of copyright" as specified in 17 U.S.C. §§ 102, 103.'" *Id.* (internal citations omitted).  This determination does not involve the additional issue of whether the logo is entitled to protection by the Copyright Act.  *See Fin. Info.*, *Inc. v. Moody's Inv. Serv.*, *Inc.*, 808 F.2d 204, 209 (2d Cir. 1986) (quoting the Act's legislative history for the proposition that "[a]s long as the work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify.") (no internal quotation marks in the case); *see also Berge*, 104 F.3d at 1463 (explaining that "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection").  The logo comes within the scope of the Copyright Act because it is a graphic work fixed in a "tangible medium of expression" from which it can be perceived and reproduced.  17 U.S.C. § 102(a)(5).  There is no indication that the logo was in fact copyrighted, but as the inquiry is limited to whether a

work comes under the scope of the Act, and not whether it is actually protected under the Act, this has no bearing on the conclusion that the first element required for preemption is satisfied here.

Second, it must be decided whether "'the rights granted under state law" are "'equivalent to any exclusive rights within the scope of federal copyright set out in 17 U.S.C. § 106.'" *Berge*, 104 F.3d at 1463 (internal references omitted).  These federal rights include "the exclusive right to (1) reproduce the work, (2) prepare derivative works based on the work, [and] (3) distribute copies of the work."  *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993) (citing 17 U.S.C. § 106).  Thus a conversion claim based solely on the reproduction of a work within the scope of the Copyright Act, or the creation of a derivative work[18] based on the original work, or the distribution of the work would be preempted.  *See, e.g.*, *Yost v. Early*, 589 A.2d 1291, 1303, 87 Md. App. 364, 388-89 (Ct. Spec. App. 1991) (concluding that to the extent a conversion claim was based on the reproduction of sheets containing computer codes, it was preempted).

A conversion claim is not preempted, however, "'if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work.'"  *Berge*, 104 F.3d at 1463 (internal citations omitted).  This "extra element" is necessary to transform "the nature of the state law action so that it is '*qualitatively* different from a copyright infringement claim.'"  *Id.* (internal reference omitted; italics in original).  In order to determine whether "a particular cause of action involves rights equivalent to those set forth in § 106" and is

---

[18] A derivative work is "based upon one or more preexisting works . . . [in] any other form in which a work may be recast."  17 U.S.C. § 101.

21

thus preempted, or whether an "extra element" is present such that preemption does not occur, "the elements of the causes of actions should be compared, not the facts pled to prove them." *Trandes*, 996 F.2d at 659 (internal references omitted).  Some consideration of the specific allegations in each case is necessary for preemption analysis, however, in order to establish and then to compare the elements of the state law cause of action asserted with the rights created by the Copyright Act.  *See Berge*, 104 F.3d at 1463 (explaining that a conversion claim is preempted "'where the plaintiff alleges only the unlawful retention of its intellectual property rights'" and defining as "crucial [   ] that Berge makes no claim that appellants converted any tangible objects embodying her intellectual property") (internal references omitted).

ATIS's allegations regarding the logo focus on its alleged misuse at the hands of the defendants, which involved modifying the logo and then using it on the invoices sent to IRM subscribers.  This is evident both in the plaintiff's examination of Mr. Hall during trial (Trial Tr., 230:23-232:15, Sept. 12, 2006) as well as in the plaintiff's characterization of its own claim in its opposition to the defendants' current motions (*see* Pl.'s Opp'n at 13) (discussing how Mr. Hall allegedly modified the logo and put it on TXI's invoices, and stating that "[t]his act of conversion made it impossible for ATIS to use the logo to send out invoices to IRM subscribers for the same IRM fees.").  Creation of derivative works and distribution or copying of the work (or in this case, of the derivative work) are rights guaranteed by the Copyright Act.  *See Trandes*, 996 F.2d at 659.  Thus, to the extent that the claim for conversion of the logo is grounded in any modification, copying or distribution of the logo that Mr. Hall and TXI may have done, it is preempted by the Copyright Act, and the defendants are entitled to judgment as a matter of law. *See Harper & Row Publishers*, *Inc. v. Nation Enter.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on*

*other grounds*, 471 U.S. 539 (1985) (stating that "[i]f unauthorized publication is the gravamen

of their [conversion] claim, then it is clear that the right they seek to protect is coextensive with

an exclusive right already safeguarded by the [Copyright] Act").

ATIS attempts to salvage its claim for conversion of the logo by stating that Mr. Hall did

"take a *tangible* version of the ATIS IFAST logo" because he took invoices ATIS had previously

prepared for IRM subscribers featuring the logo.  (Pl.'s Opp'n at 13; italics in the original.)  As

discussed previously, a conversion claim is not preempted where the "extra element" of "'the

unlawful retention of the tangible object embodying the work'" is present.  *Berge*, 104 F.3d at

1463 (internal references omitted).  To the extent that ATIS's claim for conversion of the logo is

based on Mr. Hall's unlawful retention of the invoices,[19] it is not preempted.  ATIS cannot,

however, pursue allegations involving modification, copying, or distribution of the logo under

the auspices of a conversion claim simply because a "tangible object embodying the work" is

involved.  ATIS's claim for conversion of the logo is thus properly limited to a claim that Mr.

Hall converted any tangible property containing the logo.  *See*, *e.g.*, *Oddo v. Ries*, 743 F.2d 630,

635 (9th Cir. 1984) (explaining that a claim based on conversion of the "papers comprising [a]

manuscript" was not preempted; note the identification of the tangible objects constituting the

work and the implied limitation of the conversion claim to them) (internal references omitted).

---

[19]  It is not clear whether Mr. Hall took a hard copy of an invoice or whether the invoices
were stored in the billing database.  (Trial Tr., 231:12- 232:15, Sept. 12, 2006.)  This analysis
assumes a hard copy was taken because plaintiff's counsel refers to one being produced during
discovery (*id.* at 231:20-22), and the defendants neither contest nor agree with this representation
in their reply briefing.  Mr.  Hall's trial testimony, however, states he obtained the logo from the
database, not in hard copy.  (*Id.* at 231:24-232:15.)  A claim of conversion of the logo based on
this action appears vulnerable to the same challenge raised with respect to conversion of the
billing database (discussed further below); namely, that ATIS retained a copy of the database–
and all its contents–  current as of the time of Mr. Hall's departure.

The conversion claim ATIS pursued at trial was not limited in this manner.[20]  This is evident in the repeated focus on the defendants' conduct with respect to the *logo* rather than any *tangible items* on which the logo was displayed.  (*See*, *e.g.*, Trial Tr., 230:14-231:6, Sept. 14, 2006.)  In addition, the plaintiff did not present testimony or evidence about the value of any such tangible property; rather, the plaintiff's expert on damages testified regarding "the value of the business operations of IFAST" and "the damages [to ATIS] caused by the transfer" of IFAST from working with ATIS to working with TXI.  (Trial Tr., 116:14-17, Sept. 14, 2006.)  This approach considers the logo, if at all, as part of those items and activities constituting IFAST and capable of generating funds through IRM fees[21]– precisely the capacity in which the conversion claim is preempted by the Copyright Act because it implicates the use, reproduction, modification, and distribution of the logo as opposed to the unlawful taking and retention of the invoices themselves.

To the extent that the aspect of the conversion claim involving the taking of any tangible property containing the logo, such as the invoices, is not preempted, a new trial must be ordered.  It is impossible to know what conclusion the jury would have reached had the claim been properly circumscribed at trial.  It should be noted that the plaintiff's ability to recover damages for conversion of the tangible items containing the logo at a new trial will be limited to the value

---

[20]  A related argument not properly before the court, due to the defendants' failure to raise it during their Rule 50(a) motions, is that the logo is not tangible property and thus cannot be converted under Maryland law.

[21]  According to the plaintiff, the logo factored into the damages calculation because "Mr. Hall used the ATIS IFAST logo on the very invoices that he sent to IRM subscribers instructing them to redirect their IRM payments to him."  (Pl.'s Opp'n at 17.)

of these items themselves, if Mr. Hall in fact took any such items.[22]

*Conversion– Database*

The billing database contains the information, such as names and addresses, necessary to prepare invoices for IRM subscribers.  It was the result of work by Mr. Crowe (and his company) and Ms. Hayes.   Ms. Hayes and Mr. Crowe had distinct spheres of responsibility: she maintained the information contained in the database, while he managed the software that supported the database.  As a result of this collaboration, copies of the database were constantly shared between Ms. Hayes at ATIS and Mr. Crowe at CNP.[23]  Mr. Hall obtained his copy of the

---

[22]  Indeed, it may well prove difficult if not impossible for the plaintiff to produce evidence as to the invoices' fair market value at the time of the alleged conversion, which is the usual amount a plaintiff is entitled to recover for conversion, because it seems unlikely that the invoices would, in fact, have a market price beyond the paper on which they were printed.  *See Zachair, Ltd. v. Driggs*, 762 A.2d 991, 1003-04, 135 Md. App. 403, 426-27 (Ct. Spec. App. 2000) (reciting standard means of assessing damages in conversion cases); *Traveltown, Inc. v. Gerhardt Inv. Group*, 586 F. Supp. 256, 258 (N.D.N.Y. 1984) (listing items, including manuscripts and notes, as examples of personalty lacking market value greater than the material on which they were composed).  Other measures of damages for conversion have sometimes been relied upon in the event that no market value of the converted item exists.  *See, e.g., id.* (explaining that the "absence of a market price does not necessarily preclude a determination of value for the purpose of recovering damages from a tortfeasor where there is some alternative rational means of ascertaining value") (internal citations omitted).  Such means do not always exist, however, and if ATIS retained copies of the invoices in some fashion, its loss from Mr. Hall's alleged conversion might be *de minimis.  See id.* at 258-59 (awarding nominal damages for conversion of one set of architectural blueprints where the plaintiff retained a copy; noting that "different compensatory considerations" would have arisen if the plaintiff had brought a claim involving the intellectual property contained in the plans) (internal citations omitted).  In deciding to award nominal damages only, the court in *Traveltown* also found it significant that there were "no allegations or evidence that the defendant has made any use of, or realized any profit from, the converted blueprints," such as re-selling the prints or constructing a building based on the prints.  586 F. Supp. at 258 (internal references omitted).  While ATIS has alleged that the defendants in this case have made use of the invoice in that they modified and then distributed the logo on their invoices, this type of use is not properly considered in a claim for conversion because it is preempted by the Copyright Act, as discussed above.

[23]  ATIS paid Mr. Crowe's company for services he rendered to IFAST.

database from Mr. Crowe.  ATIS had a copy of the database as it existed at the time of Mr.

Hall's departure from ATIS in November 2004.  (Trial Tr., 23:18-24:2, Sept. 12, 2006.)

Because ATIS retained this copy of the database, its claim that the database (as it existed

prior to Mr. Hall's departure) was converted fails as a matter of law.  As Mr. Murphy stated in

the final part of his motion for judgment as a matter of law at the close of all the evidence:[24]

"ATIS has a copy of the billing database, the evidence showed, that was current as of the time

Ed Hall left." (Trial Tr., 72:25-73:2, Sept. 18, 2006.)  As explained in the court's jury instruction

on conversion (to which neither party objected), conversion requires a "distinct act of ownership

or dominion exerted by one person over the personal property of another in denial of or

inconsistent with the other person's right to possess the property."  (Trial Tr., 20:6-10, Sept. 19,

2006.)  Thus if the other person (or entity, in this case) is not deprived of the property in

question, there can be no conversion.  *See Home Paramount Pest Control Cos. v. FMC*

---

[24]  Counsel did not raise this ground in his initial motion for judgment as a matter of law at the close of the plaintiff's evidence, however, under Fed. R. Civ. P. 50(b), any motion for judgment as a matter of law made prior to the submission of the case to the jury may be renewed after trial.  *See* Fed. R. Civ. P. 50 advisory committee's note (2006) (noting this change, which dispenses with requiring a motion to be made at the close of all the evidence).  Because this ground was part of counsel's second motion for judgment as a matter of law during trial, the court may consider it when deciding this post-trial renewed motion for judgment as a matter of law.  Mr. Murphy's statement during his motion at the close of all the evidence certainly could have addressed the legal relevance of ATIS's possession of a copy of the database with greater specificity.  *See* Fed. R. Civ. P. 50(a)(2).  It was clear from the context of the argument that the law of conversion was at issue, however, and not only were the general requirements of a conversion claim understood by the parties (as seen in their submission of jury instructions on the topic), but focus on the status of IFAST's relationship with ATIS rather than the specifics of the individual claims was evident on both sides over the course of this litigation.  Given these circumstances, it is appropriate for the court to consider the argument that ATIS's continued possession of a copy of the database causes its claim for conversion of said database to fail as a matter of law.  Even if it were not appropriate, the court's conclusion would be the same because the intangibility argument, discussed below, applies to the database at all points in its existence.

*Corp./Agric. Prods. Group*, 107 F. Supp. 2d 684, 693 (D. Md. 2000) (granting summary judgment to the defendant on claim for conversion of sales data where plaintiff "has not produced any evidence to show that it was denied access" to the data at issue because conversion under Maryland law "requires 'the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor'") (quoting *Yost*, 589 A.2d at 1303); *see also Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.*, 2006 WL 2572474, at *23 (D. Md. September 5, 2006) (unpublished) (concluding that claim for conversion of customer list fails because, *inter alia*, "[p]laintiffs do not allege any facts showing that they were in any way excluded from using the customer list and customer information" even after the defendants obtained it) (citing *Yost*, 87 Md. App. at 380 and *Home Paramount*, 107 F. Supp. 2d at 693).

ATIS attempts to distinguish its claim for conversion of the database from the situation in *Orteck* by characterizing billing for IRM fees as a non-competitive activity (*See* Pl.'s Opp'n at 12, n.12), thus the defendants' use of the billing database to send invoices to IRM subscribers precluded ATIS from also using it for that purpose.  It is true that it would likely have caused confusion to subscribers (at best) or disruption of the administration of IRM codes (at worst) for ATIS to send bills to subscribers for the same services that Mr. Hall and TXI were invoicing them for, and ATIS should be commended for the prudence and respect for the public interest shown by its decision not to pursue this course of action.  ATIS's wise decision, however, does not mean it was in fact "denied access" to the information in the database, *see Home Paramount*, 107 F. Supp. 2d at 693, but rather that it (laudably) chose not to make use of its continued access to this information to send out invoices or otherwise contact IRM subscribers.  The rationale of *Orteck* as well as *Home Paramount* is thus applicable here.

27

Insofar as ATIS seeks to encompass the database as it existed after the time of Mr. Hall's departure within its conversion claim, it is concerned with having access to the most current information about IRM subscribers rather than any updates or changes to the software in which this information was stored and organized.  As plaintiff's counsel himself explained at the preliminary injunction hearing with respect to ATIS's claim about the billing database:

> What we are talking about being converted here is not the software program that Mr. Crowe [may] or may not have developed and may or may not own a copyright and some enhancements to an off-the-shelf FileMaker application . . . He can keep that . . . What we are talking about is the actual data that is very important to use for the maintenance and assignments of IRMs . . .

(Mot. Tr., 579:7-16, May 19, 2005.)  Counsel also focused on the information contained in the database in his opposition to the defendants' motions during trial, arguing that ATIS gave the database its value because

> [w]hat creates value for this information is not the FileMaker program, which, you know, you can pull it off the shelf, you can get Mr. Crowe to build.  But if you don't have this information, and the information is not absolutely up-to-date, it's useless.  That's a key point, and that's what ATIS did.

(Trial Tr., 148:14-20, Sept. 14, 2006.)  The defendants do not dispute this distinction between the software and the information stored in it, but claim that it works in their favor because "there is a difference between the billing database and the information that's in the billing database . . . [the information is] names, addresses, [and] contact information.  That's not something that's subject of [sic] ownership."  (Trial Tr., 144:10-21, Sept. 14, 2006.)   In their renewed motion, the defendants expand upon the legal framework of their position,[25] contending that the customer

---

[25]  The defendants did not waive their right to question the legal sufficiency of the claim for conversion of the database anymore than they did with respect to the claim for conversion of the logo, as discussed previously.  First, a legal argument may be made in a motion for judgment as a matter of law under Rule 50, *see Varghese*, 424 F.3d at 421; there is no reason why failure

data is intangible and thus not the proper subject of a conversion claim.

Maryland law permits an action for conversion of tangible property or "intangible property rights that are merged or incorporated into a transferable document." *Allied Inv. Corp.*, 731 A.2d at 964-65 (internal citations omitted).  The latter category includes items such as stock certificates as "one example of documents into which intangible property rights, corporate shares, typically merge." *Id.* at 965.  Maryland has not been as expansive as some states in recognizing intangible rights for the purposes of conversion; it has refused "to extend the tort . . . to cover completely intangible rights," limiting recognition to those intangible rights where ownership is established, transferred, or maintained through documentation. *Id.*  Under this view, "[a] customer list and customer information is not the type of intangible information generally thought to 'merge' with or be 'incorporated' into a transferable document." *Orteck*, 2006 WL 2572474, at *23 (citing Restatement (Second) of Torts § 242 cmt. a (1965) and *Allied Inv. Corp.*, 731 A.2d at 964-65,  354 Md. at 561-62 (citing part of this section of the Restatement as well)).  Such information is not capable of being owned the same way a corporate share is; a compilation of customer information does not, as a matter of course, carry with it the right to exclude all others from also possessing the same information, whereas stock certificates convey the right to exclusive ownership of the shares set forth in them.  ATIS thus cannot claim a right to the intangible property of the customer information added to or updated in the billing database

---

to object to a jury instruction would negate this avenue, although it would certainly seem to strengthen the movant's position to raise its argument whenever permissible.  Second, it was proper for the defendants to submit an instruction on conversion given that they would have been aware that at least one of the allegedly converted items– the accounts receivable– is a legitimate subject for a conversion claim, *see Medi-Cen Corp.*, 720 A.2d at 972.

after Mr. Hall's departure,[26] thus the defendants are entitled to judgment as a matter of law on all aspects of the claim for conversion of the database.[27]

*Conversion– Damages*

Because the defendants are entitled to judgment as a matter of law on the claim of conversion of the database, and judgment as a matter of law on the claim of conversion of the logo (to the extent it is preempted) and a new trial (to the extent some aspect of the claim survives), the issue of whether the amount of damages awarded by the jury warrants the granting of a new trial must be considered only with respect to the conversion of the contested accounts receivable.[28] The accounts receivable at issue are those for which ATIS contends invoices

_____

[26] The information's intangibility and lack of merger into a transferable document also supplies an additional ground for granting judgment as a matter of law to the defendants with respect to the database as it existed prior to Mr. Hall's departure.

[27] Because this part of the motion has been resolved, only brief comment about the argument that the claim for conversion of the database is preempted by the Copyright Act is warranted. Applying the two-part test, it is likely the claim would be preempted. *See Berge*, 104 F.3d at 1463. The contents of the database come within the scope of 17 U.S.C. §§ 102, 103 as a compilation of information, *see generally Feist Publ'ing, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 356-59 (1991) (discussing Copyright Act's protection of factual compilations possessing sufficient originality), and as the claim for conversion of the database is concerned only with copying the database (existing at the time of Mr. Hall's departure) and modifying the database (changing or adding information after his departure), it lacks the "extra element" necessary to make it qualitatively distinct from a copyright action, *see Berge*, 104 F.3d at 1463.

[28] The defendants also suggest that the lack of hard copy or computer-based evidence of the values of these accounts causes the claim for their conversion to fail and requires a new trial. While this argument contains a valid point of substantive law, *see Medi-Cen Corp.*, 720 A.2d at 972 (requiring documentation of accounts receivable to recover for their conversion) (citing, *inter alia*, *Allied Inv. Corp.*, 123 Md. App. at 101-05), it would have more properly been made as part of a Rule 50(a) motion because it does not go to the weight or credibility of the evidence but the legal ramifications should that evidence not exist. Had this argument been made as part of a Rule 50(a) motion, the plaintiff would have had the opportunity to offer whatever relevant evidence may have existed. *See* Fed. Rule Civ. P. 50(a) advisory committee's notes (2006) (explaining that a Rule 50(a) motion "informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that

should have been sent in fall 2004, prior to Mr. Hall's departure, but no invoices were actually

sent until winter 2004, after his departure.  In an email exchange between Mr. Hall and the

defendants' financial expert, Mr. Cal Klausner, Mr. Hall states that $100,280 of IFAST's

collections in 2005 came from 2004 accounts receivable that should have been invoiced prior to

his departure from ATIS, thereby establishing a specific amount for the accounts receivable at

issue.[29]  (Ex. B, Pl.'s Opp'n; Pl.'s Trial Ex. 203.)  The defendants contend these emails do not

provide evidence sufficient for a jury to have determined the market value of the accounts

receivable.  It is not necessary, however, for the court to consider this argument (or the related

argument about the collectibility of the accounts) because regardless of whether the evidence

could have allowed the jury to make this determination, it is not clear that the jury in fact did.

The items that were the subject of the conversion claims were not listed separately on the

verdict sheet.  The jury awarded $439,000 as the market value of ATIS's converted assets but

did not specify the amount at which each individual asset was valued.  Presumably the jury

obtained this figure from the total amount IFAST received in 2005 from IRM invoicing (*see*

Trial Tr., 236:24-237:17, Sept. 12, 2006; Trial Tr., 115:1-7, Sept. 13, 2006; Ex. E, Pl.'s Opp'n,

---

may be available").  Regardless of when it would have been best to raise this point during trial,
failure to have done so at all prevents the defendants from now advancing it as grounds for a new
trial.  *See* 11 Wright, Miller & Kane, Federal Practice and Procedure § 2805 (explaining that "[a]
principle that strikes very deep is that a new trial will not be granted on grounds not called to the
court's attention during the trial . . .").

[29]  Mr. Klausner asks: "Can you break out for me of the $438,346 in collections for 2005,
how much represented collections for either prior years or advances for future years[?]" Mr. Hall
replies: "I calculate $100,280 in 2004 Accounts Receivable.  IFAST sent out 47 invoices in
December 04 [after Mr. Hall's departure from ATIS] that should have been sent out during the
fall of 2004.  The first payment was received by IFAST in [sic] Jan 5, 2005."  (Ex. B, Pl.'s
Opp'n; Pl.'s Trial Ex. 203.)

Pl.'s Trial Ex. 186)[30], which was $438,345.86.[31]  The contested accounts receivable ($100,280,

by Mr. Hall's calculations)[32] are thus likely contained within the $439,000, but absent any

indication by the jury that it actually determined the value of each asset independently such that

the amounts awarded for the logo and the database could be removed from this total, leaving

only the $100,280 for the accounts receivable, it would risk amounting to an arbitrary decrease

of damages for the court to assume that $100,280 was the damages figure for the accounts

receivable arrived at by the jury.  *See* 11 Wright, Miller & Kane, Federal Practice and Procedure

§ 2815 (cautioning that "[e]xcept in those cases in which it is apparent as a matter of law that

certain identifiable sums included in the verdict should not have been there, the court may not

arbitrarily reduce the amount of damages").

        The best course of action seems to be to order a new trial limited to the issue of damages.

*See id.* at § 2814 (noting the most common type of partial new trial that is granted is on issue of

damages).  Although not identical procedurally, the circumstances of this case resemble those in

*Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186 (4th Cir. 1982), *reh'g granted and rev'd in part*,

712 F.2d 899 (4th Cir. 1983).  In that case, the Fourth Circuit ordered a new trial limited to

damages where the trial court had ordered "remittitur[33] as a means of correcting its perceived

---

[30] Note that IFAST's '05 financial statement (Ex. E, Pl.'s Opp'n, Pl.'s Trial Ex. 186) shows when IRM fees were received, but not when invoices for them were sent.

[31] Because of the disposition of the claims of conversion of the logo and the database, it is not necessary to consider the defendants' arguments about whether this figure could properly stand as damages for conversion.

[32] Interestingly, Mr. Klausner (the defendants' financial expert) disputes the $100,280 figure arrived at by Mr. Hall.  (Trial Tr., 38:11- 39:5, Sept. 18, 2006.)

[33] Remittitur allows the plaintiff the choice either of having "a new trial or of accepting the amount of damages that the court considers justified."  11 Wright, Miller & Kane, Federal

error" in submitting an issue to the jury that it subsequently concluded should not have been

submitted. *Id.* at 205. The appellate court explained that where "a jury's undifferentiated lump

sum damage award is made up of a number of properly compensable items and one

noncompensable item, use of remittitur involves judicial correction of a jury's verdict by a

process of determining 'an unknown fraction of an unknown portion of an unknown whole.'" *Id.*

at 206 (internal citation omitted). Such action by the trial court "goes beyond the traditional

bounds of the device for correcting jury excess," because it "impermissibly infringes" on the

defendant's right to trial. *Id.* (internal citation omitted).

There are two potentially significant distinctions between *Arnold* and this case. The first

is procedural: counsel for the defendants in this case did not object to the jury instruction which

submitted the conversion of the database and logo claims to the jury, whereas counsel in *Arnold*

"duly objected to the submission to the jury of pain and suffering as a compensable item of

damages on the wrongful death claim." *Id.* at 205. The second is more substantive: in this case,

there is at least some basis in the record for "closely approximat[ing]," *id.* at 206 (internal

citations omitted), the amount of the damages award attributable to the conversion of the

database and logo (by subtracting everything greater than $100,280 from the award amount),

while there does not seem to have been any such basis in *Arnold*, *id.* at 206 n.20.

Neither distinction ultimately renders *Arnold*'s rationale inapplicable. This court has a

procedurally proper basis for having concluded post-trial that the conversion of the database and

logo claims should not have gone to the jury, even if no objection was made to the jury

instruction itself. The lack of a verdict form "which broke out the exact amount[] awarded", *id.*,

---

Practice and Procedure § 2815.

for the accounts receivable means that the approximation of the damages which have been held

to be unavailable to the plaintiff following the partial grant of judgment as a matter of law for the

defendants is not a close enough approximation to permit remittitur.  *See id.* (distinguishing

*Arnold* from cases where remittitur was appropriate for reducing the pain and suffering

component of a damages award where the juries in those cases "returned special verdicts which

broke out the exact amounts awarded for this item").[34]  To summarize the general approach in

*Arnold*: where a jury's award has effectively been rendered excessive based on post-trial

decisions that an issue should never have been submitted to the jury, a new trial on damages

should be ordered unless the amount attributable to the wrongly submitted item can be

established with substantial clarity.  *See id.* at 205-06.

Under Maryland law, which this court must apply when sitting in diversity and ruling on

a motion for a new trial based upon the alleged excessiveness of the damages awarded,[35] *see*

*Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) (citing *Gasperini v. Ctr. for*

*Humanities, Inc.*, 518 U.S. 415 (1996)), a new trial "may be directed if the court determines that

the verdict is grossly excessive, shocks the conscience of the court, is inordinate, or is simply

excessive." *McCollum v. McDaniel*, 136 F. Supp. 2d at 476 (citing, *inter alia*, *Banegura v.*

*Taylor*, 541 A. 2d 969, 976, 312 Md. 609, 624 (Ct. App. 1988)).  In light of the fact that the

---

[34] Note that the other caveat in *Arnold*– that remittitur might be appropriate where the wrongly include amount(s) could be capped by a maximum available in the record, 681 F.2d at 206 – is not the case here because it is not clear what amounts the jury attributed to the logo and the database.

[35]  Although the defendants never use the term "excessive", implicit in their argument that no evidence existed from which the jury could decide properly damages is that any damages awarded were improper and thus excessive.

34

damages awarded for the conversion claim encompass two items that should not have been

submitted to the jury– the logo (to the extent it was preempted) and the database– the total of

$438,345.86 is excessive, and a new trial on damages for conversion of the contested accounts

receivable will be granted.[36]

*Damages for ATIS's Lost Value*

In their briefing, the defendants do not challenge the $100,000 awarded for ATIS's lost

value (Verdict Sheet, Compensatory Damages ¶ d), although Mr. Murphy indicated during oral

argument that his clients potentially had issues with this figure.  The verdict sheet instructed the

jury to base this amount on counts 1- 4, which are breach of fiduciary duty, conversion, tortious

interference, and conspiracy (which the jury did not find any defendant liable for), respectively.

In light of the fact that the $100,000 is based on two counts undisturbed by the court's decision

today, it is not clear on what grounds the defendants believe a challenge may exist.

## CONCLUSION

The defendants are entitled to judgment as a matter of law on the claim for conversion of

the database and for conversion of the logo (to the extent it is preempted by the Copyright Act);

they are entitled to a new trial on the claim for conversion of the logo (to the extent some aspect

of it survives preemption) and on the issue of damages for conversion of the contested accounts

receivable.


A separate order follows.

---

[36]  A new trial would of course not be necessary if the parties could agree on the amount
of the contested accounts receivable at issue, either by accepting Mr. Hall's figure or reaching
consensus on another figure.

  September 27, 2007                                    /s/
Date                                        Catherine C. Blake
                                            United States District Judge